MAE M. STEWART, ADMINISTRATRIX OF THE ESTATE OF RANDALL E. STEWART, DECEASED, AND MAE M. STEWART, ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF RANDALL E. STEWART, DECEASED, PLAINTIFFS-APPELLANTS, v. HENRY K. NORTON, TRUSTEE OF THE PROPERTY OF THE NEW YORK, SUSQUEHANNA & WESTERN RAILROAD COMPANY, A BODY CORPORATE, DEFENDANT-RESPONDENT.

Argued December 18, 1950—Reargued January 29, 1951—

Decided April 9, 1951.

*Mr. Samuel Doan* argued the cause for the appellants (*Mr. Louis C. Friedman* on the brief; (*Mr. Charles C. Stalter,* attorney).

*Mr. Charles S. Barrett, Jr.* argued the cause for the respondent (*Messrs. Lum, Fairlie & Foster,* attorneys).

The opinion of the court was delivered by

ACKERSON, J.   Randall E. Stewart was killed when the automobile he was driving was struck by the engine of a train

of the New York, Susquehanna and Western Railroad Company at a grade crossing in the Borough of Hawthorne. His widow, Mae M. Stewart, instituted this action as administratrix of his estate and also as administratrix *ad prosequendum* under the "Death Act," *R. S.* 2:47–1 *et seq.,* against the trustee of the railroad company to recover damages resulting from his death. Judgment was entered in favor of the defendant in the trial court on the return of a jury verdict of no cause of action. The Appellate Division of the Superior Court affirmed, and, since one judge dissented, the plaintiff has appealed here as a matter of right pursuant to *Rule* 1:2–1(b).

The record discloses that the mishap occurred on the afternoon of February 4, 1948, at the point where the railroad company's three sets of tracks, running north and south, intersect Warburton Avenue, a public highway, running east and west. The two tracks nearest to the easterly approach of Warburton Avenue to the crossing were used only as sidings, while the third or most westerly track was the main line for through traffic.

The decedent approached the crossing at about 3:45 o'clock in the afternoon travelling in a westerly direction on Warburton Avenue. There was a heavy fall of fine snow and visibility was poor. There were 13 coal cars standing on the middle siding to the north of the crossing (to the decedent's right), the nearest being 34 feet therefrom, so that from a point 6 feet east of the first siding (the direction from which the Stewart car was approaching) and 10 feet south of the northerly curb line of the highway there was a view of 66 feet up the main line track in the direction from which the train came, and, of course, this distance gradually increased as a traveler moved past the first siding. There were also 12 coal cars standing on the middle siding to the left or south side of the crossing.

On the edge of the highway at each side of the crossing the railroad company had installed a signaling apparatus to warn of approaching trains, consisting of an automatic "flagman" commonly known as a "wigwag." These devices were of a type approved by the Public Utility Commission and, in addi-

tion to the wigwags or swinging arms and a standard loud-ringing bell 14 inches in diameter, there were also affixed to each structure a cross-buck sign bearing the words "Railroad Crossing," a shield reading "Look and Listen," lighted by an oil lamp, a reflex button sign displaying the words "Stop when Swinging" and an electric light in the semaphore arm which lighted up, night or day, when the arm was in motion. These signaling devices were designed to operate continuously from the time a train entered the electric contact circuit until it passed out of it. For a train proceeding in a southerly direction, as in the case of the train in question, the circuit is designed to start the wigwags operating when the train is about 1700 feet away from and continue until it has passed over the crossing.

On the occasion in question both of these automatic signaling devices were operating—the bells were ringing and the swinging arms were moving—as plaintiff's intestate came to the crossing. According to the testimony of eye-witnesses who were approaching the crossing from the opposite direction, the Stewart car came to a stop about six feet east of the easterly track and after waiting several seconds started to cross over with the crossing signals still operating and on reaching the main track was struck by the oncoming train. These witnesses also testified that they heard the engine's whistle blow "almost continuously" after leaving North Hawthorne station, some 1986 feet to the north, until the train reached the crossing, and this was corroborated by the engineer and other witnesses. The engineer stated that the engine's headlight was on because of the snowstorm; that the engine bell weighing 51 pounds had rung continuously from the time the train began its run at Butler, several miles to the north, and he blew the whistle at the signal point 100 feet south of the North Hawthorne station giving two long and two short blasts which he repeated at the Central Avenue crossing, 713 feet north of Warburton Avenue, and it had blown continuously from that point to the latter crossing. The foregoing facts do not seem to have been controverted. Additionally it should be noted it was not

shown that the train was going at an excessive rate of speed and tests made shortly after the fatal occurrence disclosed that the crossing signals were working properly.

Among the specifications of negligence in the complaint is the charge that the defendant permitted its crossing signals to be out of order so that for long periods of time the bells rang and the wigwag signals operated continuously whether or not trains were actually approaching the crossing. On her main case the plaintiff attempted to offer testimony in support of this asserted ground of negligence. However, the trial judge, on defendant's objection thereto, refused to receive it at that time on the ground that it was not evidential of defendant's primary negligence, but he also ruled that it could be introduced later in rebuttal of the defense of contributory negligence. When it finally came in during the course of the plaintiff's rebuttal it was to the following effect: Louis Bay, mayor of Hawthorne, testified that he had passed over this crossing about five times a week during the period of six months prior to the occurrence in question and had noticed the crossing signals operating on 20 to 25 occasions when no train came through for possibly five minutes; that on many other occasions the signals were operating and a train came through in less time, and conversely on other occasions the signals were not operating and no train crossed. George Grillo, borough clerk, testified that he used the crossing on an average of four or six times daily five days a week, during the same period. He observed that, at specified times, the signals were operating while a train was standing in plain view either at the North Hawthorne station to the north or at the Diamond Bridge crossing 1478 feet to the south, picking up and discharging mail, but he admitted that he always waited and these trains came through in a "few minutes," and on many other occasions he waited when the signals were operating and a train came through in a short space of time. The plaintiff, Mrs. Stewart, testified that on one previous occasion, two nights before the accident, she and her husband arrived at the crossing about midnight. She said "the signal light was wigwagging

and there were coal cars parked to my right. We waited for a couple of minutes and proceeded across the track. There was nothing there." How far or in what direction her observation extended and whether a train passed through shortly after their crossing does not appear. Nor is there any evidence in the case that the crossing signals ever failed to operate when a train was passing through.

The trial judge submitted the case to the jury with the binding instruction that if there was any negligence on the part of the defendant it could only be "because it placed its [coal] cars on the middle siding at that particular location, under the weather conditions as then existed, and if that was not negligence, then the defendant is not guilty of any negligence in this case" and in such an event the defendant would be entitled to a verdict of no cause of action. But on the other hand, if the defendant was negligent in the placement of the cars under the prevailing conditions, then the jury would have to consider whether the plaintiff was guilty of contributory negligence. There were no requests to charge submitted by the plaintiff and the sole objection to the charge as delivered was on the ground "* * * that all the surrounding facts should be taken into consideration"—meaning that the foregoing testimony regarding the operation of the crossing signals on other occasions when no train was immediately approaching should have been submitted to the jury as the basis for an inference of negligence on the part of the railroad company.

Thus we have presented the principal question raised by this appeal, i. e., whether the trial judge erred in refusing to submit to the jury as a ground of primary negligence on the part of the railroad company (as distinguished from contributory negligence on the part of the decedent) the foregoing evidence in relation to the operation of the crossing signals whether or not trains were immediately approaching the crossing.

The plaintiff's argument is predicated on the theory that the crossing signals were defective and operated "continuously" whether trains were approaching or not; that they were

therefore no warning of approaching trains to travelers who knew of this condition, but on the contrary amounted to an invitation indicating that they could cross the tracks in safety, and the question of whether this constituted negligence on the part of the defendant as a proximate cause of the fatal accident was a jury question.

The evidence, however, does not sustain the plaintiff's contention. It does not disclose a "continuous" operation of the crossing signals, and, without this there is no competent evidence that they were defective or out of order. The most that can be deduced from the evidence is that traffic had to wait on some occasions from two to five minutes for a train to pass through—usually, it would seem, while the train got to the intersection either from the North Hawthorne or Diamond Bridge stations which were within sight of the crossing. There is no evidence that a train did not go through the crossing after variable intervals ranging up to several minutes following the starting of the signals. Nor is there any evidence that they continued to operate after the train had passed. Indeed in every instance mentioned by the witness Grillo, who used this crossing more than any other person appearing in the case, when the crossing bells were ringing he saw a train, either at the nearest station or approaching the crossing and he always waited until the train had passed by, and, as he acknowledged, the signals served their intended purpose, although, on some occasions, necessitating a relatively short delay to travelers. In short the evidence does not spell out "continuous" operation of the signals nor that the devices were defective or out of order.

While the silence of a crossing bell may, under the conditions specified in *R. S.* 48:12–84, entitle a traveler to assume that it is safe to cross and, perhaps, in effect, be viewed as an invitation to do so, nevertheless, the actual ringing of the crossing bell, under the circumstances here exhibited, could not be considered by the decedent as an invitation to pass over the crossing, for the signals given inherently proclaimed the im-

minence of danger and the probability that a train was in the vicinity of the crossing.

Obviously the operation of the crossing signals, under the circumstances of the present case, had reference only to the question of decedent's contributory negligence and not to primary negligence on the part of the defendant. *Cf. Maryland Electric Rys. Co. v. Beasley,* 117 *Md.* 270, 83 *A.* 157 (*Md. Ct. of App.* 1912) ; *Wells v. Baltimore & Ohio Southwestern Ry. Co.,* 153 *Ill. App.* 23 (*Ill. App. Ct.,* 1910) ; *Pennsylvania R. Co. v. State,* 53 *A.* (2*d*) 562, 566 (*Md. Ct. App.* 1947) ; *Pruey v. N. Y. Central & H. R. R. Co.,* 58 *N. Y. Supp.* 797, 41 *App. Div.* 158 (*N. Y. Sup. Ct., App. Div.* 1899), affirmed 166 *N. Y.* 616, 59 *N. E.* 1129 (*N. Y. Ct. of App.* 1901) ; *Note :* 13 *A. L. R.* 942, at *p.* 949 ; 44 *Am. Jur., Railroads,* § 536, *pp.* 784, 786.

█ █ Furthermore, assuming negligence on the part of the defendant with reference to the alleged "continuous" operation of the crossing signals whether trains were approaching or not (although, as observed, the evidence does not support it), nevertheless, this could not be considered as a proximate cause of the fatal accident unless it also appeared that the decedent had knowledge of this circumstance and relied thereon. The mere fact that on one occasion, two nights before the accident, the plaintiff and her husband came to the crossing when the signals were operating and, after waiting a "couple of minutes," passed over safely without observing a train (although it does not appear that one did not come through shortly thereafter), would not be enough to warrant an inference that the decedent knew of the alleged vagaries of the crossing signals on prior occasions and relied thereon. To permit the jurors to draw such an inference under these circumstances would be permitting them to indulge in pure speculation on an important element of liability. *Horandt v. Central Railroad Co.,* 78 *N. J. L.* 190, 194 (*Sup. Ct.* 1909) ; *Passarello v. W. J. & S. R. R. Co.,* 98 *Id.* 790, 792 (*E. & A.* 1923).

As to the assignments of error on specified rulings of the trial court regarding the admissibility of evidence, suffice it to

say we have examined them with care and find no merit therein.

The last point argued for a reversal is that the verdict is against the weight of the evidence. This, too, we find to be without merit.

The judgment below is affirmed.

*For affirmance*—Chief Justice VANDERBILT and Justices CASE, HEHER, BURLING and ACKERSON—5.

*For reversal*—Justice OLIPHANT—1